792 So.2d 812 (2001)
Lori CLOUD, Plaintiff-Appellee,
v.
RINGGOLD NURSE CARE CENTER, Defendant-Appellant.
No. 34,856-WCA.
Court of Appeal of Louisiana, Second Circuit.
June 20, 2001.
*813 Joseph B. Stamey, Counsel for Appellant.
Brittain & Sylvester by Russell L. Sylvester, Counsel for Appellee.
Before PEATROSS, KOSTELKA and DREW, JJ.
KOSTELKA, J.
Ringgold Nurse Care Center ("Ringgold") appeals the Judgment of the trial court which awarded penalties and attorney fees to Lori Cloud ("Cloud"). Cloud answers the appeal, arguing that the attorney fee award was too low, the determination that she was a part-time employee was in error, and that the trial court erred in failing to tax as costs the expert fee and deposition cost. For the following reasons, we reverse in part and affirm in part as amended.

FACTS
On May 28, 1998, Cloud, in the course and scope of her employment with Ringgold, injured her back in the process of lifting a patient with the assistance of another employee. This fact was stipulated to by the parties. She reported the injury to her supervisor shortly after it occurred. On that same date, she visited her family physician, Dr. Greg Bell, and, after seeing him, Cloud was referred to an orthopaedic physician, Dr. A.E. Dean ("Dr.Dean"), who began treatment of her on June 2, 1998.
Dr. Dean diagnosed Cloud with spondylolisthesis, Grade I or Grade II, and an acute lumbar strain. At that time, she was treated with a back corset, heat, and back exercises, and Dr. Dean instructed her to return in two weeks. He also advised that she could only return to sedentary work; however, with the unavailability of such work with Ringgold, she was instructed to return for work only after she was fully released by her physician.
After that, Cloud began receiving workers' compensation indemnity benefits in the amount of $113.30 a week, which benefits were calculated based on her classification as a part-time employee with Ringgold. Cloud was still receiving her benefits at the time of trial.
*814 Cloud returned to see Dr. Dean shortly after her first visit, at which time he recommended that an MRI be performed. The MRI revealed degenerative change at the L4-5 level without definite herniated disc or spinal stenosis. Dr. Dean recommended surgery which Cloud favored. At that time, Dr. Dean placed her on physical therapy twice weekly and filed a request with Risk Management Service ("RMS"), the third party administrator of Cloud's claim, seeking authority for surgery (a decompression with lumbar laminectomy and posterolateral fusion for spondylolisthesis at L5-S1). Ringgold requested that Cloud seek a second opinion with Dr. Carl Goodman ("Dr.Goodman").
Dr. Goodman first saw Cloud on August 7, 1998. After the initial visit and a review of her MRI, Dr. Goodman's impression was that Cloud suffered lumbar strain and sprain superimposed on grade one spondylolisthesis at L5-S1. Based on that diagnosis, he did not believe surgery was the best route for Cloud and should only be performed as a last resort. Instead, he advised she go through a vigorous trunk stability program, rehabilitating the trunk muscle through strengthening and aerobic conditioning along with general physical therapy.
At Cloud's next visit with Dr. Goodman on November 18, 1998, she informed him she was unable to perform the physical therapy. Dr. Goodman also was informed that Cloud had undergone a myelogram and CT scan prior to her examination by Dr. Goodman, and that these tests did not show any significant disk herniation or spinal stenosis. Dr. Goodman continued to recommend against surgery, and instead favored conservative treatment of her injury. Additionally, Dr. Goodman agreed that Cloud was unable to return to work at that time.
Ringgold, through RMS, heeded the recommendation of Dr. Goodman against surgery and authorized only conservative treatment for Cloud as recommended by Dr. Goodman. Dr. Dean continued that course of treatment for Cloud, although he continued to recommend surgery.
Cloud filed a Disputed Claim for Compensation (LODL WC Form 1008) on May 18, 1999 with the Office of Workers' Compensation ("OWC"), alleging that she had suffered an on-the-job injury on May 28, 1998 and that Ringgold had failed to authorize medical treatment, to correctly pay weekly benefits and to correctly pay medical benefits. She also alleged entitlement to penalties and attorney fees. These claims were contested by Ringgold.
As a result of the disagreement between Drs. Goodman and Dean regarding Cloud's course of treatment, Ringgold ultimately filed a request with the OWC for an independent medical examination ("IME"). Dr. Pierce Nunley ("Dr.Nunley") was appointed by the OWC to conduct the IME, which was performed on July 23, 1999. On that same date, Dr. Nunley issued his report wherein he stated his recommendation of discography and a procedure referred to as an EMG ("EMG") of Cloud's lower extremities before deciding on a course of treatment. Dr. Nunley further suggested that Cloud might be a candidate for introadiscal electrothermal therapy ("IDET"). Some of these recommendations were implemented by Cloud and Dr. Dean.
In November, 1999, Dr. Nunley issued a second report regarding the results of the EMG and nerve conduction study. In that report, Dr. Nunley concluded that it was reasonable for a surgical procedure to be performed on Cloud without first performing the discography. Following that report, Cloud's surgery was soon authorizied, *815 and was performed by Dr. Dean on or about November 30, 1999.
The trial of this matter was conducted on April 27, 2000. The Workers' Compensation Judge ("WCJ") rendered Judgment partially in favor of Cloud and partially in favor of Ringgold. Specifically, the WCJ determined that Cloud's injury and aggravation of her pre-existing condition were caused by and related to the work-related injury at Ringgold. Additionally, the WCJ concluded that Cloud was a part-time employee of Ringgold at the time for the purpose of calculating her weekly benefits, with the correct weekly compensation rate being $113.30 based on an average weekly wage of $169.95. Finally, an award of $2,000 in penalties and $4,500 in attorney fees was made in favor of Cloud with no explanation of how the penalties and attorney fees were attributed. The appeal by Ringgold ensued, with an answer to the appeal filed by Cloud.

DISCUSSION
Ringgold appeals the award of penalties and attorney fees, and Cloud answers the appeal seeking (1) an increase in attorney fees, (2) a determination that Cloud was a full-time employee and not a part-time employee as determined by the WCJ, and (3) the addition to its award of expert fees for Dr. Dean.

Penalties and Attorney Fees
We review the WCJ's award of attorney fees and penalties under the manifest error standard. Kelley v. Jack Jackson Const. Co., 32,663 (La.App.2d Cir.12/30/99), 748 So.2d 1270, citing, Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840 (La.07/01/97), 696 So.2d 551; Oliveaux v. Riverside Nursing Home, 29,419 (La.App.2d Cir.04/02/97), 691 So.2d 340.
As stated, the Judgment awarded Cloud $2,000 in penalties and $4,500 in attorney fees. However, the Judgment was rendered without any reasons for the award, so we can only speculate as to the WCJ's reasons behind the award and its amount. At the trial of this matter, two issues were raised relative to the WCJ's ability to make such an award, those being (1) whether Ringgold failed to timely authorize and provide medical treatment to Cloud (i.e., the surgery recommended by Dr. Dean), and/or (2) whether Ringgold timely paid Cloud her compensation benefits.

Failure to Authorize Surgery
This court has consistently held that failure to authorize a medical procedure for an employee eligible to receive workers' compensation is deemed to be a failure to furnish compensation benefits, thereby triggering the penalty provisions of the Louisiana Workers' Compensation Act. Gay v. Georgia Pacific Corp., 32,653 (La. App.2d Cir.12/22/99), 754 So.2d 1101.[1]
Penalties and attorney fees for failure to timely pay benefits shall be assessed against an employer or insurer unless the claim is reasonably controverted or such nonpayment results from conditions over which the employer or insurer had no control. La. R.S. 23:1201; Brown v. Texas-LA Cartage, Inc., 98-1063 (La.12/01/98), 721 So.2d 885. Gay, supra.
The Louisiana Supreme Court, in Brown, 721 So.2d at 890, has addressed *816 the standard for determining when a claim is "reasonably controverted," noting that:
Unreasonably controverting a claim, which is the exception at issue in this case, requires action of a less egregious nature than that required for arbitrary and capricious behavior....
The phrase "reasonably controverted," on the other hand, mandates a different standard. In general, one can surmise from the plain meaning of the words making up the phrase "reasonably controvert" that in order to reasonably controvert a claim, the defendant must have some valid reason or evidence upon which to base his denial of benefits. Thus, to determine whether the claimant's right has been reasonably controverted, thereby precluding the imposition of penalties and attorney fees under La. R.S. 23:1201, a court must ascertain whether the employer or his insurer engaged in a nonfrivolous legal dispute or possessed factual and/or medical information to reasonably counter the factual and medical information presented by the claimant throughout the time he refused to pay all or part of the benefits allegedly owed....
See also, Woods v. Ryan Chevrolet, Inc., 30,206 (La.App.2d Cir.02/25/98), 709 So.2d 251, 257, writ denied, 98-1169 (La.06/05/98), 720 So.2d 689 ("Reasonably controverting a claim means that the payor has factual or medical information of such a nature that it reasonably counters that proved by the claimant"). Moreover, the provisions allowing the imposition of penalties and attorney fees are penal in nature and must be strictly construed, allowing recovery only in cases where the facts negate probable cause for nonpayment. Woods, 709 So.2d at 257.
In this case, both the factual and the medical information available to Ringgold served to reasonably controvert the claim for authorization of the surgery Cloud sought following her injury. Ever mindful of the strict standard on appeal, a careful review of the medical records and the actions of Cloud in response to her medical treatment, nevertheless, leads us to the conclusion that the WCJ was clearly wrong in awarding any penalties and attorney fees for Ringgold's failure to authorize Cloud's surgery earlier.
The first mention of surgery for Cloud is contained in Dr. Dean's report of June 26, 1998. At that time, Dr. Dean also noted that Cloud was in agreement regarding the surgery. However, he also reported that he wanted to put Cloud on physical therapy prior to her having the surgery. The June 29, 1998 report was the first where Dr. Dean noted that he was seeking approval to proceed with the surgery.
Shortly thereafter, in August, 1998, Cloud was examined by Dr. Goodman, who subsequently examined her on one other occasion in November, 1998. Although Dr. Goodman was aware that Dr. Dean wanted to perform surgery on Cloud, he did not believe surgery was the best course of action for her, because she was overweight, out of condition and very emotional. Moreover, Dr. Goodman noted that Cloud complained of upper back pain, not lower back pain where the spondylolisthesis was located.[2] In lieu of surgery, Dr. Goodman recommended a weight loss program along with a conditioning program, with epidural cortisone injections, with the understanding that he would not recommend *817 surgery until Cloud had attempted to give that course of treatment a try.[3]
After her November, 1998 visit to Dr. Goodman, there is no record of Cloud seeing Dr. Dean again until January 13, 1999. At that time, Dr. Dean noted Dr. Goodman's recommendation for epidural steroid injections, expressing doubt as to the effectiveness of that treatment for Cloud. There is a second report of the same date, wherein Dr. Dean noted he had met with Becky Prudhomme ("Prudhomme"), the medical case manager assigned to Cloud's case by RMS. In that report, Dr. Dean stated that "[t]he patient wished to try some high-voltage galvanic stimulation," for which Dr. Dean wrote a prescription. There was no additional recommendation of surgery at that point in time.
Cloud did not return to see Dr. Dean until May 17, 1999. At that point in time, Dr. Dean again made a recommendation for surgery.[4] However, in her next visit to Dr. Dean on June 29, 1999, he made these notes:
She is also advised to try to get a hold on her weight. She states she has lost 10 pounds. She is to continue trying this and doing a lot of walking and exercising. She also needs to get her nerves under control as well. She is to return as needed. As I understand it, she is to see Dr. Nunley on 7/23/99 as a second opinion for possible surgery and fusion. She needs to lose weight prior to surgery and get her muscles more active but she also may need psychological testing as well. (Emphasis added).
Shortly thereafter, on July 23, 1999, the IME was performed by Dr. Nunley at the request of Ringgold. Dr. Nunley agreed with the diagnosis of Drs. Dean and Goodman. Regarding Cloud's need for surgery, he stated that his "personal opinion is that I would perform a discography and also EMGs of the lower extremities prior to making a decision as to which procedure I would choose. She may be a candidate for IDET.... Also, I should note that following this work-up I may would [sic] recommend exactly the procedure that Dr. Dean has proposed." (Emphasis added). Obviously, Dr. Nunley did not quickly resort to the surgery, but instead made recommendations for alternative treatments, as did Dr. Goodman, which were followed up by Prudhomme and Cloud and implemented by Dr. Dean.
Cloud's last reported visit to Dr. Dean prior to the surgery was on November 6, 1999, at which time he noted her visit to Dr. Nunley and his recommendation for discography and IDET. Dr. Dean noted that Cloud's EMG was negative. At that point in time, he opined that she had enough conservative treatment and that surgery was now appropriate.
Finally, in his November 12, 1999 letter to Prudhomme, Dr. Nunley stated that he believed that it was "reasonable for the patient to be approved by [sic] the procedure requested by Dr. Dean, if both the patient and Dr. Dean are in agreement with this." Shortly thereafter, on November 22, 1999, RMS and Cloud received the recommendation from the OWC to proceed with the surgery pursuant to Dr. Nunley's last report, and the surgery was performed on November 30, 1999.
Not only the discussed medical information, but the factual information available to Ringgold also supports its actions not to *818 immediately authorize surgery. Ringgold had information that Cloud was interested in exploring alternative treatments to surgery. Dr. Goodman's November, 1999 medical report signifies that Cloud had attempted physical therapy. Prudhomme also testified that Cloud indicated an interest in pursuing alternatives to surgery. Specifically, Prudhomme explained that Cloud had found a newspaper article on IDET and asked Prudhomme to get additional information regarding the procedure, which indicated to her that Cloud was interested in perhaps this form of treatment as an alternative to surgery. In fact, Cloud admitted that she had researched and was interested in having the IDET performed.
We conclude that the medical and factual information available to Ringgold supports our finding that it reasonably controverted Cloud's claim seeking authorization for surgery. Ringgold's decision clearly was not dependent only on the medical opinion of Dr. Goodman. Significant is Dr. Dean's opinion, as late as June, 1999, that Cloud should lose weight prior to any surgery. Moreover, when Dr. Nunley initially saw Cloud in July, 1999, he clearly believed that alternative treatments should be tried prior to the last resort of surgery. It is also noteworthy that Cloud did not seek treatment from Dr. Dean regularly between January, 1999 and May, 1999 or then between June, 1999 and October, 1999.
Upon Dr. Nunley's final recommendation, Ringgold promptly authorized the surgery. Cloud's argument that Ringgold delayed in requesting the IME is unpersuasive, because pursuant to La. R.S. 23:1123, "any party" may request an IME. Clearly, it was also within Cloud's power to request the IME earlier in her treatment if she was so desirous of having surgery and not considering alternative treatments.
Considering the medical and factual information available to Ringgold, it clearly acted reasonably in controverting Cloud's claim for surgery, and set forth a valid reason or evidence upon which it based its decision to deny, initially, authorization for Cloud's surgery. The evidence before the WCJ here was abundant and to disregard that would give little meaning to an employer's, i.e., Ringgold's, ability to reasonably controvert the claim of an injured employee. Therefore, considering the foregoing, and applying the standard enunciated by the Louisiana Supreme Court in Brown, supra, we conclude that Ringgold possessed both factual and medical information which reasonably countered the medical information presented by Cloud regarding her request to authorize surgery. Recognizing the standard of review regarding findings of fact by the WCJ, we must conclude, however, that the WCJ was clearly wrong in her apparent determination that Ringgold acted unreasonably; therefore, we find that any award of penalties and attorney fees regarding that issue were improper.

Failure to Timely Make Benefit Payments
Another reason for which the WCJ may have imposed penalties and attorney fees against Ringgold is in connection with the timeliness of two of Cloud's weekly benefit payments. Specifically, Cloud argues that Ringgold was untimely in paying (1) the first installment of benefits, and (2) benefits for the first week following her injury.
The first installment of compensation payable for temporary total disability, permanent total disability, or death shall become due on the fourteenth day after the employer or insurer has knowledge of the injury or death, on which date all such compensation then due shall be paid. La. R.S. 23:1201(B). (Emphasis added). Louisiana *819 Revised Statute 23:1201(F) provides for the imposition of a penalty when the employer or insurer fails to timely pay, together with reasonable attorney fees.[5]
The first payment made to Cloud was issued on June 16, 1998. Ringgold argues that Cloud saw Dr. Dean on June 2, 1998 at which time he restricted her to sedentary work, arguing that the statutorily prescribed fourteen days in which an employer must commence benefit payments would begin on that date; therefore, the first installment issued on June 16th fell within the statutorily mandated period. However, according to item number 7 of the Employer's Report of Occupational Injury or Disease dated June 1, 1998, Ringgold admitted having knowledge of Cloud's injury on May 28, 1998. According to the clear and unambiguous language of the statute, Cloud's first installment of compensation should have been issued on the fourteenth day after the date Ringgold had knowledge of the injurywhich date would have been June 11th, making Ringgold's June 16th payment five days late. This late payment should have resulted in an imposition of a $250 penalty against Ringgold (five days at $50 per day). Additionally, we determine that attorney fees of $750 for the litigation of that issue are reasonable under the circumstances.[6]
Cloud also argues that the first week of benefits were untimely made. Louisiana Revised Statutes 23:1224 states: "No compensation shall be paid for the first week after the injury is received; provided, that in cases where disability from injury continues for six weeks or longer after date of the accident, compensation for the first week shall be paid after the first six weeks have elapsed." Here, there was no dispute that Cloud's disability continued for six weeks after the date of her accident, thus making due and payable compensation for the first week following her injury. Six weeks following her May 28th accident would have been July 10, 1998. Cloud received compensation for the first week following her accident on July 14, 1998, merely four days following the mandated six-week delay under La. R.S. 23:1224.
There is little authority interpreting this statute; however, in Brown, 721 So.2d at 891, the employer made the claimant's payment for the first week of compensation three weeks after the expiration of the six-week delay prescribed in La. R.S. 23:1224. The Brown court deemed the three-week delay unreasonable without further discussion. In this case, however, *820 we cannot say that a four-day delay following the expiration of six weeks is unreasonable. Primarily, we note that La. R.S. 23:1224 only states that this payment shall be paid "after" the six weeks have elapsed. Moreover, a precise inspection of the days on which the subject dates fell is also helpful. As stated, six weeks from the date of the accident would have been July 10, 1998 a Friday. The payment was made on Tuesday, July 14th, which would have been only the second business day after the elapse of six weeks. Clearly, considering the time necessary for processing of the payment, this very slight delay could in no way be considered unreasonable, and was, therefore, reasonably controverted in our estimation. Therefore, no penalties or attorney fees should have been awarded for the delay in Ringgold's compensation payment for the first week following Cloud's injury.[7]

Part-time Employment
In her answer to Ringgold's appeal, Cloud also argues that the WCJ erroneously determined her to be a part-time rather than a full-time employee of Ringgold. The factual findings of the WCJ are subject to review under the manifest error or clearly wrong standard. Moreno v. Simonton, 33,854 (La.App.2d Cir.12/20/00), 779 So.2d 887, writ denied, 01-0444 (La.04/20/01), 790 So.2d 634, citing, Alexander v. Pellerin Marble & Granite, 93-1698 (La.01/14/94), 630 So.2d 706; Collins v. General Motors Corp., 31,782 (La. App.2d Cir.03/31/99), 736 So.2d 947.
La. 23:1021(9) defines a part-time employee as "an employee who as a condition of his hiring knowingly accepts employment that (a) customarily provides for less than forty hours per work week, and (b) that is classified by the employer as a part-time position."
There is no dispute that Cloud initially was hired on a part-time basis or that the position for which she was hired provided for less than forty hours of work per week, clearly making her by statutory definition a part-time employee. On the date of hire, November 4, 1997, Cloud was still in training as a certified nursing assistant ("CNA") and was working towards her certification, and Cloud admitted at trial that she was hired on a part-time basis. Billy Plunkett, the administrator of Ringgold, testified that Ringgold's records reflect that Cloud was hired as a part-time employee. Finally, Martha Plunkett, the director of nurses for Ringgold, confirmed that Cloud was hired as a part-time employee.
However, Cloud argues that although she was hired on a part-time basis initially, when she obtained her certification at the end of December, 1997, she was made a full-time employee by Martha Plunkett. Billy Plunkett testified that according to Ringgold's employment records, Cloud was never changed to full-time status. Moreover, he stated that as administrator of Ringgold, he was aware of the policies and procedures of the facility and its corporate owner[8] in transferring a part-time employee to full-time employee status, and it was those policies and procedures that dictated whether an employee could be deemed a full-time employee. He further explained that typically the work schedule for CNAs entailed four days on and two *821 days off, which usually resulted in a work week of 37½ hours, the work schedule assigned Cloud. Billy Plunkett also noted that an employee could work 37½ hours a week and still be classified a part-time employee. Additionally, he stated that pursuant to Ringgold's policies and procedures, in order to be classified as full-time status, the employee must work a minimum of 130 hours in a month for two consecutive monthswhich Cloud never did. Finally, he explained that in order to qualify for Ringgold's benefit package, an employee must be a full-time employee and average thirty-two hours a week.
Martha Plunkett also testified in deposition that Cloud was never made a full-time employee, and that Cloud's personnel file did not contain the documentation which would have indicated she had ever been made full-time. She also denied ever telling Cloud that she was being made a fulltime employee. Martha Plunkett also confirmed Billy Plunkett's trial testimony that an employee could work 37½ hours a week and still be classified a part-time employee. Cloud argues, however, that Martha Plunkett's testimony conflicted with Billy Plunkett's on her ability to make Cloud a full-time employee. But, notably, Martha Plunkett agreed that she did not have unilateral authority to make an employee full time. It was her testimony that she could only convert a part-time employee to full time after it had been discussed with Billy Plunkett and he authorized the change. Further, she acknowledged that "home office" required an employee work 130 hours a month for two consecutive months to be considered full time, which testimony is entirely consistent with the testimony offered by Billy Plunkett on the issue.
The evidence relied on by Cloud does not sufficiently dispute the findings of the WCJ to make a determination that the WCJ was clearly wrong. Specifically, Cloud argues that Earl Paul ("Paul"), a nurse who was employed at Ringgold during the same period of time as she, stated that it was his belief Cloud was a full-time employee. However, we note that Paul further testified he had no factual knowledge whether Cloud was a full-time employee, and that Martha Plunkett and Billy Plunkett would be in a better position to state Cloud's employment status.
Cloud also looks to an employee meeting held at Ringgold regarding a group life insurance policy and the pamphlet which was distributed which made a reference to full-time employees. However, we note that Martha Plunkett stated the benefits offered under that program were not paid by Ringgold. Moreover, the pamphlet did not define full-time employees as those employees working an average of thirty hours per week, but offered the policy to those employees who were full-time and "working a minimum of 30 hours per week...."
Considering the forgoing, we conclude that this assignment of error raised by Cloud is without merit and that the finding of the WCJ that Cloud was a part-time employee was reasonable and not clearly wrong.

Expert Fees
In her answer to appeal, Cloud also claims that the WCJ erred in not taxing as a cost the deposition fee for Dr. Dean. Here, the WCJ ordered that Ringgold "pay for all costs of these proceedings." However, there was no specific mention of the expert fees of Dr. Dean.
Louisiana Revised Statute 23:1317(B) states as follows:
Costs may be awarded by the workers' compensation judge, in his discretion, and when so awarded the same may be allowed, taxed, and collected as in other civil proceedings. The fees of expert witnesses shall be reasonable and shall not be allowed unless fixed in the judgment. *822 The judgment rendered shall have the same force and effect and may be satisfied as a judgment of a district court. The director shall fix the fees to be charged by experts in each field of expertise on an hourly basis for the taking of the expert's deposition and travel time if the deposition is taken away from the expert's regular place of business. (Emphasis added).
Under the clear language of this statute, the question of awarding costs lies within the sound discretion of the WCJ, as it does with the courts, under the general civil provisions. Bourgeois v. Heritage Manor of Houma, 96-0135 (La.App. 1st Cir.02/14/97), 691 So.2d 703, citing, Smith v. Two R Drilling Co., Inc., 606 So.2d 804, 816, writ denied, 607 So.2d 560 (La.1992); Keyes v. Rockwood Ins. Co., 502 So.2d 223, 228 (La.App.2 Cir.1987). The trial court is not required to tax the costs of the defense's experts and witnesses against an unsuccessful plaintiff. Bourgeois, 691 So.2d at 707, citing, Ashley Enterprises, Inc. v. Esplanade Plaza Co., 425 So.2d 1010, 1014 (La.App. 5th Cir.1983), writ denied, 432 So.2d 270 (La.1983). Moreover, Edwards v. Sawyer Indus. Plastics, Inc., 31,316 (La.App.2d Cir.11/01/00), 790 So.2d 29, relied on by Cloud, stands for the limited proposition that in the event expert fees are taxed as costs, such an award must be fixed in the final judgment on the merits, not in a subsequent judgment. See, Jefferson v. Lauri N. Truck Lines, 192 La. 29, 187 So. 44 (1939). Edwards does not take away the WCJ's discretion in making such an award.[9]
Here, both parties prevailed on separate issues. The WCJ did not specifically tax the expert fees of Dr. Dean against Ringgold, and there are no written reasons to give us insight regarding the findings of the WCJ. Therefore, in light of the explicit language of La. R.S. 23:1317(B) and considering the precise wording of the Judgment, we cannot say that the WCJ erred in the apparent decision not to fix the expert fees of Dr. Dean in the Judgment.

CONCLUSION
For these reasons, insofar as the Judgment of the WCJ awarded Cloud penalties and attorney fees for the failure to authorize her surgery, we reverse that portion of the award. However, as regards penalties and attorney fees awarded Cloud for Ringgold's failure to timely make her benefits payment, we amend the Judgment of the WCJ to award Cloud $250 in penalties and $750 in attorney fees. Finally, we affirm the additional findings of the WCJ in the Judgment. Costs of these proceedings are divided equally among the parties.
REVERSED IN PART; AFFIRMED IN PART AS AMENDED.
NOTES
[1] Whereas, in Howard v. Our Lady Of The Lake Regional Medical Center, 99-1826 (La. App. 1st Cir.09/22/00), 768 So.2d 293, that court held that the obligation of the employer or insurer to furnish necessary medical treatment is limited to reimbursement and that it is only the failure to provide payment, not prior authorization, which triggers the assessment of a penalty and attorney fees.
[2] Later, in his trial deposition, Dr. Goodman expanded on this notation in his record, stating that: "Another reason I didn't think surgery was indicated is her pain was in her upper back on the right, and not in the lower back where she was, had her problem. So everything didn't jive well, and so I didn't think she was a good candidate."
[3] In Dr. Goodman's deposition, he stated that in his experience, he had not seen good results with surgery for the type of back problem experienced by Cloud. And, in fact, at trial, Cloud admitted to continued pain even after the surgery.
[4] Cloud's Disputed Claim for Compensation was filed the next day.
[5] La. R.S. 23:1201(F) states, in pertinent part, as follows:

Failure to provide payment in accordance with this Section shall result in the assessment of a penalty in an amount equal to twelve percent of any unpaid compensation or medical benefits or fifty dollars per calendar day, whichever is greater, for each day in which any and all compensation or medical benefits remain unpaid, together with reasonable attorney fees for each disputed claim; however, the fifty dollars per calendar day penalty shall not exceed a maximum of two thousand dollars in the aggregate for any claim....
[6] In setting the amount of an attorney's fee award, we have previously noted:

[A]n award of attorney's fees, while subject to the manifest error standard of review, must nevertheless be reasonable. La. R.S. 23:1201(F). Factors to be considered in imposing attorney's fees include the degree of skill and work involved, the amount of the claim, the amount recovered, and the amount of time devoted to the case. The award of attorney's fees is a type of penalty which is the imposition of the attorney's fee rather than the amount of the fee which must be assessed in accordance with law and be reasonable. (Citation omitted).
Harvey v. BE & K Const. Co., 34,057 (La. App.2d Cir.11/15/00), 772 So.2d 949, 955, writ denied, 00-3560 (La.03/09/01), 786 So.2d 732.
[7] Obviously, our disposition on the issue of penalties and attorney fees in this case pretermits any discussion regarding Cloud's request in her answer to the appeal to increase the amount of attorney fees awarded in the OWC Judgment.
[8] The corporate owner of Ringgold was never specifically named by any witness at trial or in deposition. Neither was it included as a defendant in the litigation by Cloud.
[9] The Louisiana Supreme Court has granted the Edwards plaintiff's writ of certiorari or review, which to date has not been decided. Edwards v. Sawyer Indus. Plastics, Inc., 00-3240 (La.02/02/01), 783 So.2d 376.